1  R. Christopher Harshman, Esq. (248214)
2    rch@packetlaw.com
   87 N. Raymond Ave., Suite 900
3  Pasadena, California 91103
   Telephone:  (310) 425-3529
4  Facsimile:   (310) 307-3221

5  *Attorney for Plaintiff Justice Aviation, Inc.*

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| 10  Justice Aviation, Inc., | Case no. 2:16-CV-2043 |
| 11                    Plaintiff, | **COMPLAINT FOR INJUNCTIVE RELIEF, DECLARATORY JUDGMENT, AND DAMAGES** |
| 12        vs. | |
| 13  City of Santa Monica; Frederick Cole; Nelson Hernandez; Superior Court of the | **JURY TRIAL DEMANDED** |
| 14  State of California for the County of Los Angeles; Jim McDonnell; and DOES 1-10, | |
| 15  inclusive, | |
| 16                    Defendants. | |

17  Plaintiff Justice Aviation, Inc. ("Justice" or "Justice Aviation") alleges as follows:

18                          **INTRODUCTION**

19        For almost seventy years, the City of Santa Monica (the "City") has had

20  continuing obligations, required by federal statutes and agreements it entered into with

21  the Federal Aviation Administration ("FAA"), regarding the Santa Monica Municipal

22  Airport (the "Airport") – obligations it has now been trying to avoid for several decades.

23        In exchange for agreeing to operate the Airport as a public airport, the City

24  received the land and facilities, including substantial improvements and upgrades made

25  by the federal government, that make up the Airport, along with almost $10 million in

26  federal airport development assistance funds the City put towards Airport

27  improvements. Today, the Airport is a necessary, integral, and irreplaceable part of the

28  regional and national system of air transportation and commerce.

Though the FAA and the Courts have repeatedly struck down the City's attempts to escape its commitments and avoid fulfilling the federally required promises it has made, the City now again acts contrary to those federal obligations, and in direct violation of Justice Aviation's constitutional rights, as part of an orchestrated campaign to close the Airport (which the City euphemistically refers to as "regaining local control") the Airport and in the process silence the speech of a vocal critic and community organizer, and suppress Justice's right to petition. The City has brought an unlawful detainer action[1] against Justice Aviation, seeking to evict Justice, removing it as a plaintiff from pending litigation and administrative actions and irreparably destroying Justice's business. This cannot be allowed.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), 2201-2202 (declaratory judgment), and 42 U.S.C. § 1983.

2.     This Court further has supplemental jurisdiction over state law claims under 28 U.S.C. § 1367.

3.     Venue is proper in this district pursuant to 28 U. S.C. § 1391 because the City is located within this district, and a substantial part of the events and/or omissions giving rise to Justice's claims occurred in this district.

## PARTIES

4.     Plaintiff Justice Aviation, Inc. is, and at all times mentioned herein was, a California corporation, and is the oldest and largest flight school and aircraft rental facility at the Airport, where it has operated for almost twenty-five years. Justice Aviation is essentially synonymous with its founder and namesake, Joseph "Joe" Justice.

5.     Justice Aviation is an established aviation business currently in possession of the certain Airport real property and improvements located at 3011 Airport Avenue, featuring: approximately 6,720 square feet of hangar space; 2,109 square feet of office, meeting, and conference room space; and fifteen (15) exclusive use aircraft tie-down spaces located on the common ramp adjacent to the hangar space (the "Premises").

Justice Aviation was formerly in possession of the Premises pursuant to a lease; however, Justice's lease, like those of all aviation tenants, was written by the City to expire on or before July 1, 2015, and Justice is – like all aviation tenants – currently on a "month to month holdover."

6.     Defendant City of Santa Monica is, upon information and belief, a municipal corporation duly chartered under the Constitution of the State of California. The City is located within Los Angeles County, in the State of California.

7.     Defendant Frederick Cole ("Cole") is, and upon information and belief since about May 2015 has been, the City Manager of the City of Santa Monica.

8.     Upon information and belief, Cole was hired with the specific direction to do whatever was necessary to close the Airport.

9.     Defendant Nelson Hernandez ("Hernandez") is, and upon information and belief since about November 2015 has been, the Senior Advisor to the City Manager on Airport Affairs. On information and belief, Hernandez was hired by the City to assist with its efforts to close the Airport.

10.     Defendant Superior Court of the State of California for the County of Los Angeles ("Los Angeles Superior Court" or "LASC") is a superior court organized pursuant to the California Constitution, Art. 6, § 4. An Unlawful Detainer action brought by the City against Justice is currently pending in the Los Angeles Superior Court, *City of Santa Monica v. Justice Aviation, Inc.*, LASC docket no. 16R00754 (the "Unlawful Detainer Action").

11.     Defendant Jim McDonnell is the Sheriff for Los Angeles County ("Sheriff McDonnell"); his Los Angeles County Sheriff's Department ("LASD" or the "Sheriff's Dept.") is a law enforcement agency tasked with, among other things, levying property in an eviction.

12.     Justice is unaware of the true names, involvement, or capacities, whether individual, corporate, associate, or otherwise, of Defendants Does 1 to 10 (the "Doe Defendants"), and therefore sues them by such fictitious names. Justice is informed and

1  believes, and based upon such information and belief alleges, that each of the Doe

2  Defendants is responsible for the actions described herein, has conspired with the other

3  Defendants herein, was the agent, servant, employee, or alter ego of the remaining

4  Defendants, or is otherwise responsible for the complained of actions. Justice will amend

5  this Complaint when it learns the true names, involvement, and capacities of the Doe

6  Defendants.

### General Allegations

#### The Airport

13.     The history of the Santa Monica Municipal Airport is undisputed and well

known[1] to the Court, and begins in relevant part in 1946, when the City requested[2] the

federal government, via the Surplus Property Act of 1944, 49 U.S.C. §§ 47151-47153 (the

"Surplus Property Act"), transfer interest in the Airport to the City, "for the purpose of

encouraging and fostering the development of civil aviation."

14.     That transfer occurred in 1948, under the terms of an Instrument of

Transfer (the "1948 Instrument," a true and correct copy of which is attached hereto as

**Exhibit A** and incorporated herein by reference).

15.     In 1981, the Santa Monica City Council ("City Council") adopted

resolution 6296, which stated, in relevant part: "It is the policy of the City of Santa

Monica to effect the closure of the Santa Monica Municipal Airport as soon as

possible."[3]

---

[1] *See, e.g.,* Order Granting Defendants' Motion to Dismiss, *City of Santa Monica v. United States* et al, CV 13-8046, ECF No. 31 (C.D. Cal., Feb. 13, 2014) (the "2014 Order to Dismiss").
[2] 2014 Order to Dismiss, *supra*, at *3.
[3] *See, e.g.,* May 14, 2009 Initial Decision of the Hearing Officer, *In the Matter of Compliance with Federal Obligations by the City of Santa Monica, California*, Docket No. 16-02-08 at *9, *available at* http://www.faa.gov/about/office_org/headquarters_offices/agc/pol_adjudication/agc70/casefiles/view/docs/Docket16_02_08id.pdf

16.     In 1984, to resolve hotly contested litigation concerning the City's desire to close the Airport, the City and the FAA entered into a settlement agreement (the "1984 Agreement," also known to this Court[4]), which noted, in relevant part:

> The Airport serves an important role in the regional and national system of air transportation and air commerce. It has a vital and critical role in its function as a general aviation reliever for the primary airports in the area. As a reliever facility the Airport attracts and provides service to general aviation thereby diverting aircraft away from the air carrier airports and other heavily used airports located in the Greater Los Angeles Area. Study and analysis have confirmed this congestion and that other similar general aviation reliever airports in the area are already heavily used and do not have the ability to accept or absorb the service provided by Santa Monica Airport.

17.     The City has interpreted the 1984 Agreement as releasing it from its obligation to operate the Airport as an airport, as of July 1st, 2015.

18.     The FAA[5] and the Court[6] have both ruled against this interpretation.

19.     The City has appealed[7] both decisions; both appeals are pending.

20.     The City has been engaged in seemingly endless litigation[8] in its multiple attempts at closing or severely curtailing operations at the Airport.

21.     Nevertheless, the City remains obligated to operate the Airport, as an airport, without unfair discrimination.

---

[4] 2014 Order to Dismiss, *supra*.

[5] *See, e.g.*, the December 4, 2015 Director's Determination issued by the FAA in *National Business Aircraft Association* et al *v. City of Santa Monica, California*, Dkt. No. 16-14-04 (the "2015 FAA Director's Determination") (**Exhibit E** hereto)

[6] 2014 Order to Dismiss, *supra*.

[7] The 2015 FAA Director's Determination through the FAA's internal administrative appeals process; the 2014 Order to Dismiss via appeal to the Ninth Circuit, Case No. 14-55583.

[8] *See, e.g.*, *Santa Monica Airport Association v. Santa Monica*, 481 F. Supp. 927, 945 (C.D. Cal. 1979); *affirmed* 659 F.2d 100 (9th Cir. 1981) (striking a City anti-Airport ordinance as unconstitutional); *United States of America v. City of Santa Monica*, 330 Fed.Appx. 124 (9th Cir. 2009); *City of Santa Monica v. Federal Aviation Administration*, 631 F.3d 550 (D.C. Cir. 2011) (an appeal from the final determination in FAA Docket No. 16-02-08); and *Bombardier Aerospace Corporation and Dassault Falcon Jet Corporation v. City of Santa Monica*, FAA Docket No. 16-03-11.

1

<u>The City's Obligations are Mandated by Federal Statutes</u>

2       22.     The City owns the Airport subject to the 1948 Instrument, which, pursuant

3   to the Surplus Property Act, requires that "the land, buildings, structures, improvements

4   and equipment in which this instrument transfers any interest shall be used for public

5   airport purposes for the use and benefit of the public, on reasonable terms and without

6   unjust discrimination and without grant or exercise of any exclusive right for use of the

7   airport … As used in this instrument, the term 'airport' shall be deemed to include at

8   least all such land, buildings, structures, improvements and equipment." (1948

9   Instrument, p. 4.)

10       23.     The 1948 Instrument continues to bind the City to these obligations.[9]

11       24.     The City is also the sponsor of Federal grants; the development of the

12   Airport has been financed, in part, with funds provided to the City as the Airport sponsor

13   under the Airport Improvement Program ("AIP"), authorized by the Airport and Airway

14   Improvement Act of 1982, as amended, 49 USC §47101, *et seq*. As a result, the City is

15   obligated to comply with the FAA sponsor assurances and related Federal law, 49 USC §

16   47107 (the "Grant Assurances," a true and correct copy of which are attached hereto as

17   **Exhibit B** and incorporated herein by reference). "[T]he City of Santa Monica is

18   obligated under the grant assurances until August 27, 2023."[10]

19       25.     These grant assurances "are not contractual terms open to negotiation, but

20   vital legal requirements imposed by statute."[11] Included among these Grant Assurances

21   is Assurance 22, "Economic Nondiscrimination," which requires the City to "make the

22   airport available as an airport for public use on reasonable terms and without unjust

23   discrimination to all types, kinds and classes of aeronautical activities," including

24   ───────────────

[9] *See*, *e.g.*, 2015 FAA Director's Determination, *supra*, at *5 (finding that a subsequent agreement
25   between the City and the FAA "did not address obligations after its expiration nor did it release the City
from its AIP Grant or Surplus Property Act obligations" found in the 1948 Instrument).

26   [10] 2015 FAA Director's Determination, *supra*, at *2.

[11] *Id*, at *12 (quoting *City and County of San Francisco v. FAA*, 942 F.2d 1391, 1395 (9th Cir. 1991): "The
27   conditions Congress imposed on the grant to local airport proprietors of money … are designed in part
to insure … access to airports on a reasonable and nondiscriminatory basis").

28

commercial aeronautical activities offering services to the public at the airport. Assurance 22(a); 49 U.S.C. § 47107(a)(1).

The City's Council and Airport Commission

26.     The City's municipal government takes "the 'Council-Manager' form of government."[12]

27.     The Santa Monica "City Council [consists] of seven members elected from the City at large."[13]

28.     The Santa Monica Municipal Code requires "an Airport Commission consisting of five members, which shall be appointed by the City Council."[14]

29.     During a March 2015 Santa Monica City Council meeting[15], the Airport Commission recommended the City extend no leases past July 1, 2015, and that it further adopt a leasing policy that "eliminate[s] aviation and other incompatible uses" of the Airport.

30.     During that meeting, one Airport Commission member, Lael Rubin, against that recommendation, stating: "I am a lawyer and I feel very strongly [that the City's federal obligations require] not discriminating against tenants at the airport."

31.     During that meeting, City Council Member Sue Himmelrich noted similar concerns, stating: "I am very troubled by the fact - also as a lawyer - that I view the different terms as appearing to be discriminatory, I'm still not satisfied that going for three years with some tenants and month-to-month with other tenants doesn't look non-discriminatory."

32.     During that meeting, another City Council Member noted a proposed disparity in lease terms could cause the City to "lose non-aviation tenants that we like and want to keep."

---

[12] Santa Monica Municipal Code, § 500
[13] *Id*., § 600.
[14] *Id*., § 1015.
[15] Video available at http://santamonica.granicus.com/MediaPlayer.php?view_id=2&clip_id=3470

33.     During that same meeting, the City Attorney cautioned it "would probably be adjudged discriminatory to state a policy of giving longer term leases to non-aviation uses than to aviation uses."

34.     At the same meeting, Mayor McKeown stated: "I would not be willing to give [the Typhoon restaurant] a lease that would then perhaps obligate us to give a decade-long lease to some aviation use."

35.     Also during that meeting, David Goddard, then Chair of the Airport Commission, noted, regarding the City flaunting its federal obligations: "There's no meaningful Part 16 penalty - they can withhold funds, which the city has already decided not to take." (One recent Part 16 complaint[16] instead requests "the suspension of all transportation grants (e.g., for mass transit) to the City, pursuant to 49 U.S.C. § 47111(e)" – Hernandez publicly mocked this demand that the City suffer meaningful consequences for its hostility towards its federal obligations in the media, stating for the record: "what chutzpah!"[17])

36.     At an October 27, 2015 City Council meeting[18], Mayor McKeown commented on the City's attempts to get the FAA to rule on the then-pending Part 16 complaint regarding the expiration of the grant assurances, noting: "This is the sort of thing that keeps us from doing what we want to do with [the Airport]."

37.     At that same meeting, Cole alluded to the convoluted acts the City is taking towards closing the Airport, summarizing "all of those things … are moving parts. [The] goal is to exercise our rights to local control."

38.     Later at that same meeting, City Council member Ted Winterer sought to "give direction [to City staff] to explore just eliminating the flight schools outright."

---

[16] So known because such complaints are brought pursuant to 14 C.F.R. Part 16 ("Federally-Assisted Airport Enforcement Proceedings")

[17] Matthew Hall, *City spars with Santa Monica Airport advocates over leases*, Santa Monica Daily Press (March 5, 2016), *available at* http://smdp.com/city-spars-with-santa-monica-airport-advocates-over-leases/153962

[18] Video available at http://santamonica.granicus.com/MediaPlayer.php?view_id=2&clip_id=3589

39.     Upon information and belief, on March 15, 2016, Hernandez previewed[19] an Airport report regarding a proposed leasing policy for the Airport Commission, describing the City's efforts "to phase out 'incompatible tenants.'"

40.     Upon information and belief, Commissioner Lael R. Rubin ultimately voted against the policy presented by Hernandez, saying the policy as written would open the city to a new round of litigation because she felt it amounted to a stealth prohibition on aviation tenants.[20]

41.     The media has noted: "Leases at the airport have been controversial. Last year, council provided some 3-year leases to non-aviation tenants, but declined to provide long-term leases to aviation businesses."[21]

42.     The City Council has declined to enter into leases with any aviation user of the Airport, despite multiple decisions confirming its obligation to operate the Airport in a non-discriminatory fashion remain in effect pursuant to the 1948 Instrument, and under the Grant Assurances through 2023.

<u>Current Non-Compliance With Its Federal Obligations — Leases</u>

43.     The FAA has, through Part 16 proceedings, determined that an "extended period of time and delays in negotiating a lease … was unjustly discriminatory"[22], and has cautioned "that the continued practice of using [a] closure petition as a means to dissuade, intimidate or otherwise turn away potential tenants could potentially be a violation of Assurance 24."[23] (Here, there is no closure petition, merely the City's distaste for the continued operation of the Airport.)

---

[19] Matthew Hall, *Airport lease policy advances without commission approval*, Santa Monica Daily Press (March 17, 2016) *available at* http://smdp.com/airport-lease-policy-advances-without-commission-approval/154185
[20] *Id.*
[21] *Id.*
[22] *United States Construction Corporation v. City of Pompano Beach, Florida*, FAA Docket No. 16‑00‑14 (Director's Determination), at 18 n. 63 (August 16, 2001)
[23] *Jim De Vries, et al. v. City of St. Clair, Missouri*, FAA Docket No. 16‑12‑07 (Director's Determination), at 39 (May 20, 2014).

COMPLAINT

44.     The FAA has never considered month-to-month tenancies to be fair and reasonable (nor would any business, aviation-related or otherwise). In fact, the opposite is true; the FAA has deemed short-term leases reasonable only in *very specific* circumstances[24], none of which are applicable or analogous to the situation at the Airport today.

45.     The FAA has addressed a scenario[25] somewhat like the City's current relationship with the Airport (though one where a formal petition to close the airport had actually been filed; the City has taken no such steps in this case, and in fact studiously avoids doing so, likely because the federal government could and – given the critical importance of the Airport, likely would – reclaim title pursuant to 49 U.S.C. § 47152(8) ("[w]hen a term under this section is not satisfied, any part of the interest in the property reverts to the Government, at the option of the Government")):

> [T]he Director is concerned that the Respondent appears to have used its active petition to close the airport as part of its justification to postpone hangar negotiations. As previously discussed, an airport sponsor's federal obligations are not altered or suspended based on its intent and desire to close the airport. The Director notes that the Respondent's continued practice of waiting until November to begin lease negotiations for the following year – particularly if rate increases are involved – could create a situation in the future in which it may fail to make a good-faith effort to reach an agreement. While at no time were the Complainants denied access to their leased hangars, the Director cautions the Respondent that the continued practice of using the City's airport closure petition as a means to dissuade, intimidate, or otherwise turn away potential tenants could

---

[24] *See, e.g., McDonough Properties, L.L.C., et al., v. City of Wetumpka, Alabama* (FAA Docket No. 16 12  11, Final Agency Decision and Order, at 21 (January 15, 2015) (one  year lease term found to be appropriate due to proposed reconstruction or relocation of the airport, subject to FAA approval, and a 10  year lease was ultimately offered after the sponsor's plans were abandoned); *Santa Monica Airport Association v. City of Santa Monica*, FAA Docket No. 16  99  21, Final Decision and Order, at 23 (February 4, 2003) (City justified in denying long  term leases to south  side tenants while granting long-term leases for north  side FBOs due to terms of the 1984 Agreement and its approval of plans to eliminate most aeronautical uses on the south side); *United States Construction Corporation v. City of Pompano Beach, Florida*, FAA Docket No. 16  00  14, Final Agency Decision, at 22 (July 10, 2002) (ten-year lease with a ten-year renewal option was not inherently improper, but sponsor's additional requirement of a two-year cancellation clause rendered it unreasonable).

[25] *Jim De Vries, supra*, 26-27, 36 (May 20, 2014).

> potentially be a violation of Grant Assurance 22, Economic
> Nondiscrimination, or Grant Assurance 24, Fee and Rental Structure, in the
> future.... Sponsors have the obligation to negotiate in such a way that does
> not deter potential tenants from doing business with the airport. Because the
> Respondent had requested permission from the FAA to close the St. Clair
> airport it appears that it believed it could begin to close out services to its
> aeronautical users. This is not the case.

46.   Until June 30, 2015, Justice was a long-term lessee, its most recent lease having commenced August 1, 2008.

47.   The leases for all "aviation businesses"[26] all terminated on June 30, 2015, due to the City's mistaken belief – invalidated by this Court and the FAA[27] – that it could cease operating the Airport on July 1, 2015.

48.   In spite of the fact the City has had a United States District Court find the terms of the 1948 Instrument remain in effect, and the FAA has determined that the City's federal grant assurance obligations continue until 2023, the City has refused the repeated requests of Justice – and all aviation tenants – to negotiate, offer, or execute any new leases.

49.   On information and belief, the City has offered and/or entered into multi-year leases[28] with non-aviation tenants.

50.   The City's refusal to grant leases to aviation tenants at all is clearly not compliant with its federal obligations, and offering leases to non-aviation users while maintaining aviation users on a month-to-month status is clearly impermissibly discriminatory.

Current Non-Compliance With Federal and State Requirements — Landing Fees

51.   The City has imposed landing fees on aircraft operating at the Airport, applicable to both transient aircraft and, more recently, aircraft based at the Airport.

---

[26] Using the City Council's terminology; i.e., businesses generally directly responsible for flight operations occurring at the Airport; under the 1948 Instrument and the Grant Assurances, these would properly be known as "aeronautical" tenants.

[27] See ¶¶ 22-24, notes 9-10, *supra*

[28] See ¶¶ 74-75, *infra*

52.     The City failed to follow the procedures required by either state law or its own city charter when it adopted the ordinances establishing landing fees, which precludes their adoption. That issue is currently the subject of a pending class action state court lawsuit, *Justice v. City*, BC603327[29].

53.     Even if the landing fees are found to have met the legal criteria for adoption, they are nonetheless substantially higher than the fair and reasonable amounts permitted under the applicable federal requirements[30].

54.     Further, charging landing fees for aircraft that are already paying rental fees (e.g., for tie-downs or hangars) at the Airport constitutes the sort of double-charging the FAA has cautioned against[31].

55.     Joe Justice challenged these landing fees in an October 2015 letter to the City[32].

56.     The City's violations of these federal obligations has been raised in great detail in the February 5, 2016 Part 16 Complaint[33] in which Justice Aviation is named as a complainant.

57.     The non-payment of these landing fees represent the only *rationale* (which, even if true, falls short of providing cause) the City has proffered for its pursuit of the Unlawful Detainer Action against Justice. These fees formed the basis for the City's three day notice to pay (served contemporaneously with its 30-day notice to vacate).

58.     The multiple state and federal actions currently pending are each likely to invalidate these landing fees.

---

[29] ¶ 84, *infra.*

[30] Grant Assurances 24 and 25; 49 U.S.C. §§ 47107, 47133; the FAA's "Rates and Charges Policy" (78 Fed. Reg. 55330 (September 10, 2013)); FAA Order 5190.6B.
Order 5190.6B

[31] *See generally R/T-182, LLC v. Portage County Regional Airport Authority*, FAA Docket No. 16-05-14; *Wadsworth Airport Association, Inc. v. City of Wadsworth*, FAA Docket No. 16-06-14.

[32] ¶ 82, *infra.*

[33] ¶ 83, *infra.*

1

The City's Campaign Against Aviation Users of the Airport

59.    On information and belief, in August 2015, City Manager Cole asked the City Council "for the capacity to take (the airport) on full time"[34], creating a new position.

60.    On information and belief, in or about November 2015, the City hired Hernandez as a "senior advisor for airport affairs"[35], in that newly created position, to coordinate efforts to close the airport:

> Cole announced Hernandez's appointment at last week's City Council meeting, saying the long-time government administrator will make a "significant" contribution in helping the Council achieve its "top strategic" goal of gaining local control over the century-old airfield.[36]

61.    On information and belief, in or about February 2016, Hernandez approached Charles Thomson, founder of the Santa Monica Flyers flight school at the Airport, and, in front of at least one witness, introduced himself with the proclamation: "I'm here to shut you down," or words substantially to that effect.

62.    On information and belief, the City has conspired with resident activists on a strategy to improperly 'choke' and ultimately close the Airport. On information and belief, these activists include former Chair of the City's Airport Commission David Goddard ("Goddard"), Jonathan Stein ("Stein"), and David Klass ("Klass"), among others.

63.    On information and belief, Goddard was and is a subject of a formal ethics complaint lodged with the California Fair Political Practices Commission, stemming from his participation on the City's Airport Commission.

---

[34] Hector Gonzalez, *City Hires Santa Monica Airport Point Person*, Santa Monica Lookout (November 30, 2015), *available at* http://www.surfsantamonica.com/ssm_site/the_lookout/news/News-2015/Nov-2015/11_30_2015_City_Hires_Santa_Monica_Airport_Point_Person.htm

[35] February 22, 2016 Deposition of the City's Manager, Rick Cole (rough cut) (the "Cole Deposition")

[36] Gonzalez, *supra*.

13

64. Stein identifies himself as "Treasurer of Sunset Park Anti-Airport" Inc., a group which states[37], regarding the Airport: "We advocate … termination of aviation leases, and severe reduction in flight operations."

65. During the March 25, 2015 City Council meeting, Stein called upon the City to "force down flight operations beginning immediately" and, echoing Airport Commission Chair Goddard's language, noted: "The only penalty [for the City's non-compliance with its federal obligations] is to cut off new funding for airport improvements."

66. Through Freedom of Information Act requests, electronic correspondence between Goddard, Stein, and the City (including Cole and Hernandez) has been obtained; one particularly illuminating email exchange (a true and correct copy of which is attached hereto as **Exhibit C** and incorporated herein by reference) lays out a strategy, excerpted in relevant part here:

On Dec 1, 2015, at 7:37 AM, Jonathan Stein <jstein@jsteinlaw.com> wrote:

Rick,

A summary of some of the well-discussed points last night. See you at 1030 am at BH's office at the Airport.

**Gunnell Forbearance Agreement has (i) released City from all Claims; and (ii) contains Gunnell's explicit agreement to vacate premises at end of Forbearance Period.** On Feb 29, Gunnell leaves and has no cause of action against the City. It is estopped from claiming any right established by the Part 16 proceeding (see below).

…

---

[37] http://www.spaaresidents.org

**The goal should be the military doctrine, "If you have 5 enemies shooting at you, just kill the one you can. Then you have 4 enemies shooting at you."** If you simply get rid of flight operators, total daily flight operations drop, and that is what residents want. The "Big Three" are Atlantic, Gunnell and its subtenants, and Krueger. Just get whoever you can "kill", at any time you can.

…

**Leave the runway alone. Do not touch it, it is sacrosanct.** Then, when all FBOs are gone, "spin like a magnet" and attack the runway. Use "David Goddard arguments" and establish "ripeness" through "Stein mechanics".

**Justice Aviation ejection for financial violations would be best.** Compromise to move them to "Gunnell Forbearance Agreement template" is second best. It forces them out of the Part 16 litigation immediately. Why not settlement their debt to City in return for leaving in 30 days??

67.     Upon information and belief, this plan is clearly being implemented.

68.     Gunnell left the Airport on February 29, 2016.

69.     On February 11, the City filed the Unlawful Detainer Action against Justice with the only rationale offered being, essentially, the "financial violations" Stein referenced in his email to City Manager Cole – even though Cole concedes[38] **no monies were due** at the time the City filed the Unlawful Detainer Action!

70.     Cole confirmed in his Deposition that he "exercise[d] final authority in making the determination to terminate Justice Aviation's tenancy at Santa Monica Airport."

71.     Cole has, as stated in his Deposition, "discussed with Hernandez the eviction of flight schools from Santa Monica Airport," and specifically discussed "the termination of Justice Aviation's tenancy" with Hernandez on multiple occasions.

---

[38] During his February 22, 2016 deposition in the Unlawful Detainer Action (the "Deposition"); *see* ¶¶ 91 *infra*.

72.     Cole admits in his Deposition that he has met, in person, with Stein, Goddard, and others: "In the seven months I've been City Manager, I believe three times."[39]

73.     Cole has kept Stein, Goddard, and others appraised of, *inter alia*, the lease status of flight school operators at the Airport, as in the email attached hereto as **Exhibit D** (which is hereby incorporated by reference).

74.     Cole admitted in his Deposition that a non-aviation tenant at the Airport, the restaurant Typhoon, has been offered a lease since July 1, 2015.

75.     Upon information and belief, other non-aviation tenants at the Airport – among them the Audi / VW Design Center California and law firm Milstein Adelman, LLP – have been offered or granted leases since July 1, 2015.

76.     Cole admitted in his Deposition that no aviation tenants have been offered leases since July 1, 2015, nor does the City have any plans or proposals in effect to offer aviation tenants leases.

<u>Justice Activism</u>

77.     On multiple recent occasions, Joseph Justice and his eponymous Justice Aviation have zealously advocated legal and political positions adverse to the City with regards to Airport-related matters.

78.     Joe Justice has several times been interviewed for newspaper articles regarding the City and the Airport: Dan Weikel, *L.A. City Council seeks change in takeoff routes at Santa Monica Airport*, L.A. Times (April 21, 2011)[40]; Martha Groves, *Battle over Santa Monica Airport's future revs up*, L.A. Times (November 26, 2011)[41]; and Dan Weikel, *Judge tosses Santa Monica's airport lawsuit*, L.A. Times (February 14, 2014)[42].

---

[39] Cole Deposition, *supra.*
[40] *Available at* http://articles.latimes.com/2011/apr/21/local/la-me-airport-20110421
[41] http://articles.latimes.com/print/2011/nov/26/local/la-me-santa-monica-airport-20111126
[42] http://articles.latimes.com/2014/feb/14/local/la-me-santa-monica-dismissal-20140215

79. In or about July 2014, Justice Aviation was a named complainant in a formal complaint brought before the FAA pursuant to 14 CFR Part 16 against the City of Santa Monica (*National Business Aircraft Association, Krueger Aviation, Inc., Harrison Ford, Justice Aviation, Kim Davidson Aviation, Inc., Aero Film, Youri Bujko, James Ross, Paramount Citrus LLC and Aircraft Owners and Pilots Association v. City of Santa Monica, California*, Docket No. 16-14-04). That complaint sought clarification regarding the expiration of grant assurances, which was resolved in favor of the complainants (discussed *supra*); the City has appealed, and that appeal is pending. A true and correct copy of the Director's Determination issued December 4, 2015 in that action is attached hereto as **Exhibit E** and incorporated herein by reference.

80. In the fall of 2014, Justice Aviation hosted a community rally[43] at its hangar at the Airport, where efforts to oppose the City's impermissible plan to close the Airport (including, e.g., then ballot initiative Proposition D) were discussed.

81. At a contentious March 24, 2015 City Council meeting, Joe Justice challenged the legality of the City refusing to grant aviation tenants leases, leaving those tenants in the unsustainable situation of "month-to-month" tenancy.

82. In October 2015, Joe Justice wrote the City a letter challenging the legality of the City's landing fees.

83. On December 2, 2015, attorney Richard Simon wrote the City, advising them of a new imminent Part 16 complaint, identifying Justice Aviation as one of several complainants. That Part 16 complaint was sent to the FAA on February 5, 2016 (*Mark Smith, Kim Davidson Aviation, Inc., Bill's Air Center, Inc., Justice Aviation, Inc., National Business Aviation Association, Inc., and Aircraft Owners and Pilots Association, Inc. v. City of Santa Monica, California*), FAA Docket No. 16-16-02 ("*Smith v. City*"). The *Smith v. City* Part 16 complaint raises (*inter alia*) the illegality of the City's landing fees, as well as

---

[43] Elizabeth A Tennyson, *Santa Monica advocates rally support for ballot initiative*, AOPA (August 26, 2014) *available at* http://www.aopa.org/News-and-Video/All-News/2014/August/26/SMO-advocates-rally-support-for-ballot-initiative

the City's refusal to provide aviation tenants with leases. A true and correct copy of the complaint in this action is attached hereto as **Exhibit F** and incorporated herein by reference.

84. Justice Aviation is the lead plaintiff in *Justice Aviation Inc. et al v. The City of Santa Monica et al*, a class action challenging Airport landing fees filed in the Los Angeles County Superior Court (Case No. BC603327) ("*Justice v. City*, BC603327"); that case was filed December 7, 2015 and is being actively litigated.

85. On January 6, 2016, the City served Justice Aviation with a 3-day notice to pay landing fees (the validity and legality of which continue to be disputed: *Smith v. City*, *supra*; *Justice v. City*, BC603327, *supra*), and a 30-day notice to vacate.

86. On January 8, Justice paid the outstanding landing fees and January's rent for its premises.

87. On February 1, 2016, the City refused Justice's rent payment for the month of February.

88. On February 11, 2016, the City filed the Unlawful Detainer Action against Justice.

89. Subsequent to the City's filing of the Unlawful Detainer Action, Justice and the City entered into an agreement whereby Justice would continue to pay rent on the condition that the payments not be used as a bar or affirmative defense to that action.

90. Justice is current on its rent and landing fee payments.

91. During his Deposition, City Manager Cole conceded that, at the time the Unlawful Detainer Action was filed, there were no payments that were due to the City from Justice that have not been paid, and indeed, that Justice had not been late on rent payments since before he was Manager.

92. City Manager Cole, during his Deposition, refused to state a cause for Justice's eviction.

93. Courts have long observed that "[t]he unlawful detainer statutes were . . . enacted to provide an adequate, expeditious and summary procedure for regaining

possession of real property,"[44] precluding many meritorious assertions of right that could require a complex and protracted inquiry to fairly determine – as in this case.

94.     Trial in the Unlawful Detainer Action was originally set for March 4, 2016; following an *ex parte* application based, in part, on the City's refusal to answer questions during the Cole Deposition, trial for the Unlawful Detainer Action is currently set for April 4, 2016.

95.     If the City had renewed its lease with Justice – who it has leased to for more than two decades – there could be no notice to vacate, unlawful detainer action, or potential eviction.

96.     Instead, the City wrongly and impermissibly discriminates against aviation businesses in general, and against Justice in particular, in refusing to renew, extend, or negotiate any aviation business' lease, and is actively trying to evict Justice.

97.     The City has also stated its hostility towards the other flight schools and aviation users at the Airport (including Santa Monica Flyers, American Flyers, Proteus Air Services, Skyward Aviation, Atlantic Aviation, Angel Flight West[45], and others), but so far has targeted only Justice.

Justice's New Part 16 Complaint

98.     On March 15, 2016, Justice Aviation filed a new complaint against the City, Justice Aviation, Inc. v. City of Santa Monica, pursuant to 14 C.F.R. § 16.23 (the "March 2016 Complaint"). A true and correct copy of that complaint is attached hereto as **Exhibit G** and incorporated herein by reference.

99.     The March 2016 Complaint alleges the City's violations of its federal obligations under Grant Assurances 22 and 23, and the 1948 Instrument.

---

[44] *Schulman v. Vera*, 108 Cal. App. 3d 552 (1980) (quoting *Childs v. Eltinge*, 29 Cal.App.3d 843, 853 (1973) and collecting cases)

[45] A nonprofit, volunteer-driven organization that arranges free, non-emergency air travel for children and adults with serious medical conditions and other compelling needs, enabling them to receive vital treatment that might otherwise be inaccessible because of financial, medical, or geographic limitations.

1

Justice's Damages

2    100.    Justice Aviation maintains independent contractor relationships with

3    multiple certificated flight instructors ("CFIs").

4    101.    As a result of the Unlawful Detainer, Justice Aviation has already lost two of

5    its highest performing CFIs, on or about February 19th and 26th.

6    102.    The two instructors had each been with Justice for at least a year.

7    103.    Upon information and belief, each CFI terminated their relationships with

8    Justice due to the City's actions, set forth herein, that caused each the actual fear that

9    Justice's existence – and therefore their instructor positions with the company – would

10   be eliminated immediately and with little or no notice.

11   104.    The two CFIs together were responsible for approximately $175,000 in

12   annual revenue for Justice, and, due to a "CFI shortage" in the industry, will be hard if

13   not impossible to replace.

14   105.    The departure of those instructors has left Justice with no flight instructors

15   able to provide instruction for new students seeking an instrument rating (a certificated

16   flight instructor – instrument, or "CFII"), a critical gap in the services Justice can

17   provide; on information and belief, after earning a private pilot license, training for an

18   instrument rating is the next step for almost every student who continues beyond that

19   certificate.

20   106.    Upon information and belief, Justice has also lost students to, e.g., American

21   Flyers (another flight school located at the Airport), both due to the uncertainty of

22   Justice's future at the Airport, as well as an inability to schedule flight lessons with the

23   exodus of instructors Justice has experienced since the City began moving to evict the

24   business.

25   

# FIRST CAUSE OF ACTION

26   ## *DECLARATORY RELIEF*

27   107.    Justice Aviation repeats and realleges each and every allegation contained in

28   the above paragraphs 1 to 106, inclusive, and incorporates them herein by reference.

20

108.   An actual controversy has arisen and now exists between Justice and the City as to their respective rights and duties. Justice contends, and the FAA and this Court have agreed, that the 1948 Instrument and the federal Grant Assurances continue to compel the City to, in good faith, negotiate and offer leases of a reasonable term, and to do so without discrimination or unreasonable delay or the imposition of unreasonable restrictions. The City disputes Justice's contentions, and maintains that its obligations have expired and that it is no longer obligated to provide leases to aviation tenants at the Airport.

109.   Justice desires a judicial determination of its rights and a declaration as to the validity of the City's discrimination against, and corresponding refusal to enter into leases with, aviation tenants in general, and with Justice in particular. A judicial declaration is necessary and appropriate at this time and under the circumstances so that Justice may ascertain its rights. The City's refusal to meet its obligations is causing a burden on Justice because the uncertainty regarding its future is disrupting relationships with instructors, students, and other entities with whom Justice enjoys or would otherwise enjoy beneficial relationships.

## Second Cause of Action
### *Injunctive Relief*

110.   Justice Aviation repeats and realleges each and every allegation contained in the above paragraphs 1 to 106, inclusive, and incorporates them herein by reference.

111.   Beginning on or about July 1, 2015 and continuing to the present time, defendants, and each of them, wrongfully and unlawfully refused to renew Justice's lease or negotiate in good faith a new lease with Justice, and instead began eviction proceedings against Justice at least partially motivated by Justice's exercise of its rights of free speech and petition guaranteed under the First and Fourteenth Amendments to the Constitution of the United States.

112.   On or about February 3, 2016, and since then, Justice demanded the City stop this threatened and noticed conduct; the City refused, filed the Unlawful Detainer

Action, and, due to the expedited and summary nature of those proceedings, Justice needs prompt judicial action to protect its rights.

113.    The City has steadfastly refused to respect the authority of the FAA and the FAA's holdings on matters within its jurisdiction and has acted in direct disregard of its Federal obligations as it relates to its action to evict Justice Aviation without cause, to unreasonably and unlawfully interfere with the business of Justice Aviation, and to intentionally cause harm to Justice. Although Justice continues to pursue administrative remedies through Federally-Assisted Airport Enforcement Proceedings under 14 CFR Part 16, an immediate preliminary injunction is necessary to protect Justice's federally guaranteed rights.

114.    Injunctive relief is also necessary to preserve the jurisdiction of the FAA over the pending "part 16" enforcement proceedings (and ultimately that of the United States Court of Appeals for the Ninth Circuit or the District of Columbia Circuit), pursuant to 9 U.S.C. §§ 47151(b) and 47122.

115.    Injunctive relief is further necessary to protect Justice from these unconstitutional actions brought under color of law, and as such is authorized pursuant to 42 U.S.C. § 1983.

116.    The City's wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to plaintiff as no other airport can absorb Justice's business; the owners of the aircraft that Justice leases back for its flight training and rental operations will not consent to moving their planes to any other airport; Justice's students have moved and will move to other flight schools at the Airport; and Justice will be unable to keep or attract the flight instructors necessary to be a viable flight school. Justice Aviation will simply not survive as a business, the most extreme form of great and irreparable injury.

117.    Justice has no plain, speedy, and adequate remedy in the ordinary course of law for the injuries currently being suffered and imminent should the Unlawful Detainer

Action continue to eviction, as it will be impossible for Justice to determine the precise amount of damage that it will suffer if the business is no longer viable.

## Third Cause of Action

### *Violation of 42 U.S.C. § 1983 — Retaliation*

118.   Justice Aviation repeats and realleges each and every allegation contained in the above paragraphs 1 to 106, inclusive, and incorporates them herein by reference.

119.   Justice Aviation has the right, under the First and Fourteenth Amendments to the Constitution of the United States, to "petition the Government for a redress of grievances." This right extends to the "'approach of citizens or groups of them to administrative agencies ... and to courts." *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Justice exercised this right when it petitioned the FAA, an administrative agency, in its two Part 16 complaints, and when it became plaintiff in the *Justice v. City*, BC603327 lawsuit.

120.   Justice further has a right, under the First and Fourteenth Amendments to the Constitution of the United States, to "the freedom of speech," which it, by itself and through its founder, Joe Justice, has exercised routinely, e.g., in interviews with the press on Airport related matters.

121.   The City, defendant Cole (the City's Manager), and defendant Hernandez (the City's Senior Advisor to the City Manager on Airport Affairs) (together, the "City Defendants") are intentionally attempting to deprive Justice of its right of petition; if the City Defendants succeed in removing Justice as a tenant of the Airport, Justice will no longer have standing to pursue the Part 16 complaints before the FAA, or the *Justice v. City*, BC603327 lawsuit – a fact known to the City Defendants, as pointed out in Stein's email: "It forces them out of the Part 16 litigation immediately."

122.   The City Defendants likewise intentionally acted by bringing the Unlawful Detainer Action; Justice is informed and believes that one or all of the City Defendants were motivated, at least in part, by  Justice's frequent exercise of its right to free speech.

123.    The City Defendants' acts would have deterred a person of ordinary firmness from engaging in these protected activities – among other things, the uncertainty of Justice's current position is already causing substantial harm to its business, including the loss of students and other revenue.

124.    Defendants Cole and Hernandez were acting, or purporting to act, in the performance of their official duties when they collaborated on and ultimately commenced the Unlawful Detainer Action against Justice.

125.    Defendant Cole was acting, or purporting to act, in the performance of his official duties when he exercised his final authority in making the determination to terminate Justice Aviation's tenancy.

126.    Justice Aviation has been harmed by these acts, in an amount subject to proof at trial.

127.    The City Defendants' actions were a substantial factor in causing Justice's harm.

## FOURTH CAUSE OF ACTION

### *Intentional Interference with Contractual Relations*

128.    Justice Aviation repeats and realleges each and every allegation contained in the above paragraphs 1 to 106, and paragraphs 119 to 127, inclusive, and incorporates them herein by reference.

129.    Justice Aviation had, for approximately the last year, valid contracts with two particular CFIs, where the instructors taught students and paid Justice a portion of their gross receipts. Student pilots being trained through this arrangement also rented planes on an hourly basis from Justice, which grossed a set amount per hour, or fraction thereof, of aircraft rental operation.

130.    The City Defendants knew of these relationships, as it is, *inter alia*, common knowledge that Justice rents planes and offers flight instruction.

131.   The City has intentionally failed to meet its obligations under the 1948 Instrument and the Grant Assurances, by, *inter alia*, refusing to enter into a lease with Justice.

132.   The City Defendants further brought the Unlawful Detainer Action seeking to discriminatorily evict Justice.

133.   The City Defendants are additionally carrying out an intentional campaign designed to deprive the flight schools operating at the Airport of their ability to train students, operate aircraft, or even have premises on the airport.

134.   The City desperately wants to induce breaches of the flight schools' contracts and disrupt their relationships and thus their businesses – starting with the impermissible attempt to, without cause, evict Justice Aviation.

135.   The City intended to disrupt Justice's relationships with instructors and their students, or at the very least knew that disruption of those relationships was certain or substantially certain to occur.

136.   Justice's contractual relationships with two of its CFIs were destroyed by the City's actions, or at the very least made more expensive or difficult.

137.   The damage resulting from the City's interference with Justice's contractual relationships is subject to proof at trial but estimated to be no less than $175,000.

138.   The aforementioned conduct was intended by the City to cause injury to Justice, and/or was carried on with a willful and conscious disregard for Justice's rights, and/or is despicable conduct that subjects Justice to a cruel and unjust hardship in conscious disregard for its rights; Justice is therefore entitled to an award of exemplary or punitive damages.

139.   The City Defendants' actions were at least a substantial factor in causing this harm, if not the sole reason the harm occurred.

## FIFTH CAUSE OF ACTION

*Negligent Interference with Prospective Economic Relations*

140.    Justice Aviation repeats and realleges each and every allegation contained in the above paragraphs 1 to 106, and paragraphs 118 to 127, inclusive, and incorporates them herein by reference.

141.    Justice Aviation was in multiple economic relationships with third parties, e.g., students and flight instructors, that probably would have resulted in a future economic benefit to Justice, which has been operating as a flight school for more than two decades.

142.    The City Defendants knew or should have known about these relationships, as, e.g., the July 11, 2008 lease it entered into with Justice called for Justice to provide flight and simulator training, aircraft rental and service, and other services, to the public.

143.    The City Defendants knew or should have known that Justice's relationships with students and instructors would be disrupted if the City failed to act with reasonable care; indeed, by way of example, the City Council discussed, openly and at length, the detrimental effect month-to-month tenancies would have on businesses at the Airport, and must have known that improperly moving to evict would disrupt these relationships even further.

144.    The City Defendants failed to act with reasonable care, in that, despite rulings adverse to its interpretation, the City (*inter alia*) refused and continues to refuse to enter into new lease agreements with aviation businesses at the Airport, despite continuing obligations to do so under the 1948 Instrument and the Grant Assurances.

145.    The City Defendants additionally engaged in wrongful conduct by, e.g., abdicating its obligations under the 1948 Instrument and the statutorily mandated Grant Assurances, and by proceeding with a retaliatory eviction against Justice.

146.    Justice's relationships with at least two top-performing CFIs were in fact disrupted; both instructors left Justice almost immediately following the City's filing of the Unlawful Detainer Action.

147. Justice has been damaged in an amount subject to proof at trial but estimated to be no less than $175,000.

148. Since at least December 4, 2015, the City Defendants have affirmatively known that the City continues to be bound by the obligations it entered into via the 1948 Instrument and the Grant Assurances. Notwithstanding this knowledge, the City subjected Justice to cruel and unjust hardship in conscious disregard of Justice's rights in that it refused to extend Justice a lease and thus opened the door for the Unlawful Detainer Action and Justice's potential eviction and the resulting destruction of Justice's business. Justice is therefore entitled to an award of exemplary or punitive damages.

149. The City Defendants' wrongful conduct was at least a substantial factor in causing this damage.

## Sixth Cause of Action
### *42 U.S. Code § 1985(2) — Conspiracy*

150. Justice Aviation repeats and realleges each and every allegation contained in the above paragraphs 1 to 106, and paragraphs 118 to 127, inclusive, and incorporates them herein by reference.

151. The City Defendants conspired amongst themselves and with at least Goddard, Stein, and Klass, for the purpose of impeding, hindering obstructing, or defeating the due course of justice, intentionally acting to deny to Justice Aviation the equal protection of law.

152. The City Defendants conspired amongst themselves and with at least Goddard, Stein, and Klass, for the purpose of impeding, hindering obstructing, or defeating the due course of justice, intentionally acting to injure or destroy Justice Aviation's established business as the result of the acts Justice has taken – including being a complainant in two Part 16 complaints and the plaintiff in a state court class action lawsuit – to enforce or attempt to enforce the rights of itself and other Airport users, including the class of persons defined as "[a]ll owners and/ or operators of aircraft at the Santa Monica Municipal Airport in the City of Santa Monica who have

paid landing fees and/or fuel flowage fees as set by the City," to the equal protection of law.

153. Justice has been damaged in an amount subject to proof at trial but estimated to be no less than $175,000.

154. The City Defendants' wrongful conduct was at least a substantial factor in causing this damage.

## Prayer for Relief

WHEREFORE, Justice prays judgment against defendants, and each of them, as follows:

1. For a declaratory judgment providing that Justice Aviation has a right to lease facilities at the Airport, for aviation use, on reasonable terms and without unjust discrimination;

2. For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from taking any action that unreasonably affects Justice Aviation's right, title, or interest in the Premises;

3. For a temporary restraining order, a preliminary injunction, and a permanent injunction, all enjoining the City Defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from continuing to prosecute the Unlawful Detainer Action;

4. For a preliminary and permanent injunction, each enjoining the City Defendants, and each of them, and their agents, servants, employees, and successors in office, and all persons acting under, in concert with, or for them, from bringing any future unlawful detainer action or other action against Justice Aviation in retaliation for Justice's exercise of its rights under the First and Fourteenth Amendments to the Constitution of the United States of America;

5. For a temporary restraining order and a preliminary injunction staying proceedings in the Los Angeles Superior Court Unlawful Detainer Action, as

affirmatively authorized pursuant to 28 U.S.C. § 2283, as such an order is expressly authorized by an Act of Congress, necessary in aid of this Court's jurisdiction, and to protect and effectuate the judgments of this Court;

6.     For an order requiring defendants to show cause, if any they have, why they should not be enjoined as set forth in this complaint, during the pendency of this action;

7.     For damages in the sum of no less than $175,000, plus damages in such further sums as may be sustained and as are ascertained before final judgment in this action;

8.     For punitive or exemplary damages;

9.     For costs of suit incurred in this action;

10.    For an award of attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

11.    For such other and further relief as the court deems proper.

Respectfully submitted,

Date: March 24, 2016          By: /s/ R. Christopher Harshman
                              R. Christopher Harshman, Esq.
                              Attorney for Plaintiff Justice Aviation, Inc.


### DEMAND FOR JURY TRIAL

Justice Aviation, Inc. hereby demands a jury trial on all issues to the extent permitted by law.

Respectfully submitted,

Date: March 24, 2016          By: /s/ R. Christopher Harshman
                              R. Christopher Harshman, Esq.
                              Attorney for Plaintiff Justice Aviation, Inc.

COMPLAINT